AKRON CEMENT & PLASTER CO., (CUMMINGS v.)

[See Cummings v. Akron Cement & Plaster Co., Case No. 3,473.]

## Case No. 122.

### The ALABAMA.

### The GAMECOCK.

· [1 Ben. 476.][1]

District Court, S. D. New York. Oct., 1867.[2]

COLLISION—TOW AND TUG — LOOKOUT — LIGHTS— PILOT—PLEADING.

1. The bark Ninfa de los Mares was coming up the Narrows into the harbor of New York, about 200 yards from the west shore, in the evening. She was towed by the steam tug Gamecock at the end of a hawser. She had the regulation lights set. The tug, however, did not carry the two white lights required by law to be carried by a steam vessel having another in tow, but had the lights required to be carried by all steam vessels. The steamer Alabama was going down the Narrows to sea. She was in charge of a pilot, but had no lookout stationed forward, the quartermaster in the wheelhouse, who was assisting the man at the wheel, being the only lookout. She saw the lights of the tug, and directed her course so as to pass her some fifty or a hundred feet to the eastward, but she did not see the lights of the bark in tow until she was very near the tug, when the latter gave two whistles, and a voice from her shouted that the steamer would run into the bark. The steamer's helm was at once put hard a starboard, but she ran into the bark, striking her on her starboard bow, and sinking her in a few minutes. The libel was filed against both the steamer and the tug to recover the damages. *Held*, that the Alabama was in fault in not having a proper lookout, and that her going so close to the tug, when there was abundant sea room, was, to say the least, not evidence of very careful management on her part.

[Cited in The Ancon, Case No. 348.]

2. That the fact of her being in charge of a pilot was no defence.

[Cited in The Ancon, Case No. 348.]

3. That the tug was also in fault in not having the lights required by law, and that the collision was the result of these faults on both vessels.

4. That where injury is done by or received by a vessel in *tow* of another, the inquiry, by which the responsibility of either vessel is to be determined, should always be as to which party is the principal and which is the servant.

5. That in this case the tug was the principal, and the Alabama could not charge the tug's negligence as a fault upon the bark.

6. That the fact that the libel did not specify the want of proper lights on the tug as an element in her negligence made no difference, there being no dispute as to what lights the tug had, and no surprise upon her as to the evidence given about her lights. That, if desired, an amendment of the libel to that effect would be allowed.

[In admiralty. Libel for collision. Decree for libelant. Modified on appeal by circuit court, in The Alabama, Case No. 123, but afterwards affirmed by supreme court, (92 U. S. 695.)]

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Decree of district court modified by circuit court in The Alabama, Case No. 123, but affirmed by supreme court, 92 U. S. 695.]

This was a libel for a collision brought by Nicholas de las Casas, the owner of the Spanish bark Ninfa de los Mares against the steamer Alabama and the steam tug Gamecock, both of them American vessels. The collision occurred about six o'clock P. M. on the 15th of December, 1865, in the Narrows, a little below Fort Richmond, on the Staten Island side, and about 200 yards easterly from the shore. The bark was on a voyage from Havana to New York, and was in tow of the tug going up through the Narrows to New York. She was towed by a hawser about fifty or sixty fathoms long, running from the stern of the tug to her port bow. The Alabama was proceeding to sea from New York on a voyage to New Orleans. The Alabama and the bark came into collision, and the result was that the bark was cut to the water's edge, on her starboard bow, near her fore-rigging, and sank, and was totally lost. The bark charged the fault on both of the other vessels. The case made by the libel was, that some ten or fifteen minutes before the collision, the port light of the Alabama was observed from the bark, bearing from one and a half to two points on her starboard bow, and apparently approaching in an opposite direction; that the bark had her proper lights set; that her course was about north to north half-east; that her movement was wholly dependent upon that of the tug, her master having employed the tug about 1 o'clock P. M. of that day to tow her to New York; that a few minutes before the collision a double whistle was heard from the tug, as a signal for the Alabama to pass the tug and bark on their starboard side, and for the bark to starboard her wheel, and that the tug would starboard her wheel; that this was done by the tug, but that the Alabama came right on into the bark, although the bark, by starboarding her wheel, in obedience to the signal of the tug, did all that she could to avoid the collision; and that there was no fault on the part of the bark. In regard to the fault of the other vessels, the libel averred that the collision happened "wholly through the carelessness, mismanagement, and improper seamanship of those in charge at the time of the said steamer, and of the said tug boat, in suffering their respective vessels to approach so near each other, and then on the part of those in charge of the said tug boat, in permitting the said bark to be so hit, and on the part of those in charge of the said steamer, in permitting her to so hit the said bark." The answer of the Alabama set up, that she left her dock in New York about five o'clock P. M., under charge of a pilot; that her lights were set and burning, and she was going at a slow rate of speed, and had a competent lookout properly stationed and faithfully attending to his duty; that shortly after 6 o'clock P. M., when the Alabama was near Fort Richmond, she discovered the tug a considerable distance off, bearing on her port bow; that, as the vessels approached each other, the tug changed her course suddenly, without giving any warning, and attempted to cross the Alabama's bow, and pass on her starboard side; that as soon as that intention was manifested, every effort was made by the Alabama to avoid a collision, and she cleared the tug, but collided with the bark; that the night was dark, and the fact that the tug was towing the bark on a line could not be seen or known from the Alabama before the vessels came together, or so nearly together that it was impossible to avoid a collision with the bark; that the bark had all her sails furled and could not be distinguished from a vessel at anchor, and had no proper lights or lookout, and no warning was given that she was moving astern of the tug; that the bark was responsible for the conduct of the tug, and the tug and the bark were respectively improperly and unlawfully navigated; and that the collision occurred through the fault and improper navigation of the bark, individually or in common with the fault of the tug, and not by the fault of the Alabama.

The answer of the tug averred that the towing was to be and was performed in the usual manner; that the collision did not occur through the fault of those on board of the tug; that when the Alabama was first observed from the tug she bore on her starboard bow, sailing in an opposite direction; and that she should have stopped or passed the tug and bark at a safe distance to the eastward, as she was well able to do, in which case the collision would not have taken place. The bark had a pilot on board, and was steering as nearly as possible in the wake of the tug. Her proper lights for a sailing vessel being towed were set and burning, that is, a green starboard light and a red port light, and they were properly arranged. She carried no light calculated to mislead the Alabama. The tug had the proper green and red side lights, but she did not have the two white mast-head lights arranged vertically, which were required by law to be carried by a steam vessel, when towing another vessel, in addition to the colored side lights, in order to distinguish her from other steam vessels. Instead of those lights she had a single white light on a flag pole aft. The Alabama had her proper colored side lights and her white foremast light. In this condition of the lights on the vessels they approached each other.

The pilot of the Alabama testified, that he was heading south half-west when he first saw the lights of the tug, two miles or more away; that he was then a little above Clifton, and about a quarter of a mile from the shore, and the tug's lights bore south half-east, half a point or a little more on his port bow; that he then saw her green and red lights and her white light above; that, on seeing those lights, he ordered the man at the wheel to look out for his port wheel so as to

pass to the right; that he then discovered that the tug was trying to cross his bow, the tug being to the eastward of the lights on Sandy Hook and the Navesink Highlands, and those lights being half a point to the eastward of the course of the Alabama, and the tug appearing to him to be drawing across those lights to go to the westward of the Alabama; that he then ordered the man at the wheel to keep his helm starboard, and it was kept starboard until he discovered that the tug would go clear of the Alabama, and then he told the man at the wheel to steady; that the next thing he heard was two blasts from the steam whistle of the tug, which came when the tug was not more than sixty feet from the Alabama; that at that time he saw the green and white lights of the tug; that at the time the whistles blew he heard a hail from the tug, warning him that he would be on the bark; that the helm of the Alabama was immediately put hard to starboard, and her engine was slowed, and stopped and backed, but she struck the bark within a minute after the hail; that he did not know until the hail that the tug had a vessel in tow; and that he saw no lights on the bark. On his cross examination he said that when he saw the tug drawing to the westward he starboarded to let her go to the westward of him, and straightened on his course when he thought the tug had room enough to go clear on the westward; that the whistles blew right after he straightened on his course; that he arrived at the conclusion to let the tug pass to the westward of him from three to five minutes before the tug blew the whistles; and that he expected the tug to pass him from fifty to one hundred feet off.

The captain of the tug testified that he was as near the Staten Island shore as he considered it safe to go with the bark; that up to the time he blew his whistles the Alabama was all the time on his starboard bow; that he did not change his course up to the time he blew his whistles; that when he blew his whistles he starboarded his wheel a little —all he dared, as he was then within two hundred yards of the shore; that when the Alabama was a quarter of a mile away, he saw her white light and both of her colored lights; and that the tug was heading between north and north by west.

E. W. Stoughton and J. E. Parsons, for bark.

Beebe, Donohue & Cook, for tug.

Owen, Nash & Gray, for steamer.

BLATCHFORD, District Judge. I take the testimony of the two witnesses who were piloting the respective steam vessels as showing more clearly than any other testimony the actual course of the navigation of the vessels. The captain of the tug, who was in her pilot house at the wheel all the time, had no apprehension of any collision with the Alabama. He did not put his helm to port,

or change his course, or signify, by giving one blast of his whistle, that he desired each vessel to keep to the right. As to any change of course by the tug, I think the clear weight of the testimony is, that the tug did not change her course before she blew the two whistles at the very moment of peril. The pilot of the Alabama did not blow any whistle as a signal to the tug to take the one side or the other. He arrived at the conclusion that the tug was going to the westward, and, acting on that conclusion, he starboarded his helm until he thought he could go clear of her on the eastward, and then he straightened on his course, intending to clear her by from fifty to one hundred feet. The tug did not port her helm, and thus bring herself and the bark into the danger which the Alabama was trying to avoid. She kept her course, and any apparent drawing of the tug to the westward, as seen from the Alabama, must have been the effect of the starboarding by the Alabama of her own helm, and not the cause of that starboarding. If the Alabama had thought that she and the tug were meeting end on, or nearly end on, so as to involve risk of collision, she would have ported her helm and signalled the tug by her whistle. But the Alabama starboarded her helm and gave no signal, and for the manifest reason that she apprehended no collision; and the tug certainly apprehended none. The Alabama was in no manner thwarted by the movements of the tug or of the bark, in carrying out her purpose of going to the eastward. She elected to go to the eastward a sufficient length of time before the collision to enable her to carry that intention safely into execution, as respected both the tug and the bark, but for two circumstances. These were (1st) the resolve of the Alabama to pass as close to the tug as within from fifty to one hundred feet; (2d) the absence of all knowledge on the part of the Alabama that the tug had a vessel in tow. The intention of the Alabama to pass so close to the tug would not perhaps, of itself, unattended by any other facts, be sufficient to charge her with fault in this collision with the bark. But she had abundance of room to the eastward, and a broad channel in that direction, seven or eight times in width the distance at which the tug was from the western shore, with sufficient depth of water, and it was, to say the least, not evidence of very careful navigation on the part of the Alabama, that she did not try to give a wider berth to the tug. But still the Alabama went clear of the tug, and she would doubtless have gone clear of the bark, if she had known that the bark was in tow astern of the tug. The failure of the Alabama to know that the tug had the bark in tow is shown, by the evidence, to have been owing to two things—(1) the absence, on the Alabama, of a proper lookout, properly stationed and attending exclusively to the proper duties of a lookout; (2) the failure of

the tug to carry the two bright white mast-head lights vertically, so as to distinguish her from other steam vessels. As to the lookout on the Alabama, the evidence is con-clusive that the only person who pretended to be discharging the duties of a lookout was Pullin, the quartermaster, and he, in-stead of being at his proper post on the bow of the vessel, was in the pilot-house assist-ing the man at the wheel. The rest of the men who were in the watch with Pullin, and some of whom ought to have been on the lookout on the bow of the vessel, were in the forecastle at their supper, and remained there till after the collision. The attempt to show that there was a man on the lookout on the bow of the Alabama wholly fails. No such man is produced as a witness, nor is his name disclosed. Now, if any fact is established by the evidence, it is the fact that the bark had her colored lights properly set and burning. They ought to have been seen from the Alabama, and probably would have been seen if the Alabama had had a proper lookout. It is true that the pilot of the Ala-bama, and the other persons who were in and about the pilot house of that vessel, saw the lights of the tug and did not see the lights of the bark; but it is extremely prob-able, from the evidence, that a proper and vigilant lookout on the bow of the Alabama would have discovered the lights of the bark. There was nothing in the character of the night to obscure them. The men on the bark saw the lights on the Alabama at a long distance. Moreover, the evidence goes to show that a proper lookout in a proper place on the Alabama would have discovered the bark herself in season to have enabled the Alabama to clear her. It is impossible to re-sist the conclusion, that the want of a proper lookout on the Alabama contributed mate-rially to the collision. So, also, the absence of the proper lights on the tug contributed in a great degree probably to the collision. The pilot of the Alabama discovered the lights of the tug at the distance of two miles or more, and saw them accurately, as they were, the two colored lights and the white light above. He recognized them, so far as the evidence shows, for what they indicated —a steam vessel under way. But he did not recognize them as indicating a steam vessel towing another vessel, for the reason that they gave no such indication. The provision for the two vertical white lights is made by law, as the statute expressly says, to distin-guish from other steam vessels a steam ves-sel towing another vessel. The conclusion of fact and of law is, that if the pilot of the Alabama had been advised by the presence of those lights that the tug had a vessel in tow, he would have given her a wider berth that he did, and would have cleared the bark.

It is claimed on the part of the tug that the pleadings do not raise the question of the want of proper lights on the tug. But I think the pleadings are sufficient to raise that question. The libel does not specify the want of lights on the tug, but it avers that the collision happened through the careless-ness, mismanagement and improper conduct of those in charge at the time of the tug, in suffering the tug and the Alabama to ap-proach so near each other. The want of proper lights on the tug was an element and in-gredient of the carelessness of those in charge of the tug, which contributed to the near approach of the Alabama. But, if desired, an amendment of the libel in that respect would be allowed, there being no dispute as to what lights the tug in fact had, and no surprise upon her as to the evidence given about her lights.

The bark being wholly without fault, and the collision being due to the negligence of the Alabama and the tug, it would naturally follow that the bark would be entitled to recover from the Alabama and the tug the damages caused by the collision. The an-swer of the Alabama sets up, however, that the bark was responsible, under the circum-stances, for the conduct of the tug; and it is claimed that the tug was the servant of the bark in the towing service; that the bark is liable for the acts of the tug; that the case, so far as respects the Alabama, must be decided as if the only parties liti-gating were the Alabama and the tug; and that the bark has no greater rights, as against the Alabama, than the tug would have had, if she had been injured by the col-lision, and her owner were the sole libellant. There is a conflict of decisions on this point, and it is not authoritatively settled for this court. Most of the cases on the subject are cases where the third vessel, neither the tug nor the tow, was the libelling or com-plaining party. In regard to the question whether the tug or the tow is responsible when a third party sues for a collision with either, the author of Parsons' Maritime Law, (volume 1, p. 208,) cites several of the con-flicting authorities, some of them holding that the vessel towing is but the servant of that which is towed, and that the latter is re-sponsible for the acts of the former, as its servant, and others holding that the vessel towed is for the time under the absolute control of the vessel towing, and that the latter is responsible for any mischief done, and draws the conclusion, that it is an er-ror to assume that either of these rela-tions must exist in any particular case, and that the inquiry should always be, which party is the principal and which the servant. Such I conceive to be the sound rule. The language of Mr. Justice Nelson, in the case of The Express, [Case No. 4,596,] seems to imply, that where the tug is not in fact, at the time, under the direction and control of the master and hands on board of the tow, the tow will not be responsible for any damage that happens through the fault of the tug. In the case of Sturgis v. Boyer, 24 How. [65 U. S.] 110, which was a libel

by a third vessel, against a tug and her tow for a collision between the tow and the third vessel, the supreme court condemned the tug and acquitted the tow. In the course of the opinion of the court in that case, it is said (page 122) that, "whenever the tug, under the charge of her own master and crew and in the usual and ordinary course of such employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels." It is also said, in that case, (page 123) that the owners of the tow do not, by employing a tug to transport their vessel from one point to another, necessarily constitute the master and crew of the tug their agents in performing the service; that they do not appoint the master of the tug or ship the crew, and cannot displace the one or the other; and that the master of the tug, notwithstanding the contract for the service was negotiated with him, continues to be the agent of the owners of his own vessel, and they are responsible for his acts in her navigation. It is true that these observations were made in reference to the liability of the tug and the tow to a third party. But I think that they are also applicable to a case where the tow sues the tug for an injury caused to the tow by a collision between the tow and a third vessel, to which the negligence of the tug contributed, and also to a case where the tow sues the third vessel for such an injury. In the present case, the tug was exclusively under the charge of her own master and crew. She was employed in the usual and ordinary course of her employment, to tow this bark, a foreign vessel, coming into one of our ports. The service was a customary and proper one. The pilot and master and crew of the bark did not direct, or undertake to direct, the navigation of the tug or the arrangement of her lights, and were not bound to do so. The bark did nothing but follow as closely as possible in the wake of the tug, and she made no manoeuvre which contributed to the collision or interfered with the free control of the tug over her own movements and arrangements. To say that, under these circumstances, the bark should be held responsible for the acts or omissions of the tug would be, in my judgment, to violate the sound principles of justice. Such a responsibility on the part of the bark would make her liable to a third vessel, in case the tug had negligently run into and sunk such vessel, the bark having been navigated precisely as she was in this case. A responsibility so broad would be greatly injurious to the interests of commerce, and would effectually put an end to the towing business, for no tow would then be towed unless it had the exclusive control of the tug, and no

tug would surrender such control to the tow.

If applied to this case, the effect of the doctrine contended for by the Alabama, that the tug and the bark are to be considered as one vessel, and that the bark, though personally innocent, is to have imputed to her the acts and omissions of the tug, would be, as against the Alabama, to cause the damage occasioned by the collision to be apportioned between the tug and the bark, considered as one vessel, and the Alabama. I hold that the Alabama is not entitled to the benefit of any such doctrine. The tug does not, in her answer, claim the existence or benefit of any such doctrine, or claim that the bark was responsible for the faults of the tug, or that the tug is not responsible for her own faults to the bark. It is useless to speculate whether, even if, as regards the Alabama, the tug and the bark be considered as one vessel, the tug ought not, as between herself and the bark, both the tug and the Alabama being in fault, to make good to the bark all the damages which she does not recover from the Alabama. As suggested by Mr. Justice Nelson, in the case of The Express, (before cited,) there is a difficulty, as between a tug and her tow, in assigning to each vessel its proper measure of responsibility, when either, through the fault of either, comes into collision with a third vessel. Every case of the kind must be decided, as it arises, on the facts attending it.

It is set up as a defence by the Alabama, in her answer, that she had on board, at the time of this collision, a pilot duly licensed under the laws of the state of New York, who offered his services to her, and whose services she was obliged by law to accept; that such pilot took and had the entire control of all her movements until and at the time of the collision; that her master, officers, and crew merely carried out the orders of such pilot, in directing her movements; and that, if the collision was caused by the movements of the Alabama, or by her failure to make proper movements in reference to the tug and the bark, or either, neither the Alabama nor her claimants are responsible therefor. This point of defence does not extend so far as to claim that the Alabama is not responsible for not having a proper lookout, or that the pilot was in any manner charged with the duty of seeing that she had a proper lookout. And in a case where, as here, the fault found against the vessel is not any act or omission for which the pilot is responsible, but is the want of a proper lookout, it would be going too far to say that the vessel is to be exonerated from such fault, because she had a pilot on board charged with her navigation, even if she would be exonerated from a fault in her navigation caused directly by the pilot. If the presence of a pilot is to exonerate the vessel from the fault of not having a proper

lookout, it is difficult to see why it would not exonerate her from the fault of not having her reversing machinery in proper order. Yet, to hold the vessel not responsible for the latter fault, when under charge, as to her navigation, of a regular pilot, would be a violation of all principle. I do not understand that the English rule, which relieves a vessel from responsibility for her navigation while she is under the charge of a pilot, extends any further than to relieve her from the consequences of a fault directly attributable to the bad management or negligence of the pilot. But, however that may be, the law is settled for this court, (Walsh v. The China, Cir. Ct. U. S. July, 1866, [Case No. 17,114,]) that a vessel is responsible for the negligence or unskillfulness of a licensed pilot, whose services she is by law bound to accept.

The rules of navigation are now so well settled, and in most cases by positive statute, so far at least as vessels owned by citizens of the United States are concerned, that there can be no excuse for their wilful and deliberate violation. The necessity, especially in the case of a steam vessel, of having a proper lookout, properly stationed and actually and vigilantly employed in his duty, and of having, properly set and burning, the lights required by statute, has been enforced by the courts of admiralty of the United States so uniformly. that it must now be accepted as settled, that wherever the want of a proper lookout, or the want of proper lights, is shown, it will be for the vessel which has not the lookout or the lights to show that any collision which occurs is not in any way attributable to the absence of the lookout or the lights, or she will be condemned in damages. Notwithstanding the serious admonitions which they have received from the courts, large steam vessels are most glaringly remiss in regard to having a proper lookout, and small tugs pay no heed, while towing other vessels, to the statutory requirement making provision that they shall carry two bright white masthead lights vertically, in addition to their green and red side lights, so as to distinguish them from other steam vessels, and convey to other vessels the knowledge that they have vessels in tow. The interests of commerce require that these maritime rules should be strictly enforced.

It results, that there must be a decree condemning both the tug and the Alabama in damages, with a reference to a commissioner to ascertain the amount of the damages to the libellant.

[NOTE. On appeal to the circuit court this decree was affirmed, except that it was held that the steamer could not be required to make up a deficiency caused by the fact that the value of the tug was less than one half of the damages sustained. This was overruled by the supreme court, and the decree of the district court was affirmed. See The Alabama and The Gamecock, Case No. 123, and note to that case, 92 U. S. 695.]